008-1279 Synthes USA v. GM DOS REIS Mr. Olson, good morning. Good morning. I just want to confirm that you are reserving five minutes for rebuttal. Correct, sir. The only preface I will say is that you and Mr. Lapple have brought to us a very interesting personal jurisdiction issue. Thank you. So fire away whenever you're ready. Well, I appreciate the comment because I do believe that it's an interesting issue. In fact, there's a number of interesting issues that are presented by this case. I think the one… Before we get started, and this may border on the getting into matters that you could almost fairly say are none of the Court's business, but there's something very strange about this case. I'm a little hard-pressed to understand why this is a dispute that's worthy of the expenditure of the time and resources that the parties have poured into it. Are you really concerned with the appearance of your competitor, let's say your worldwide competitor, in trade shows in the United States with their actual devices? Is that what this is all about? Presumably there are no damages here. So all we're talking about is at the end of this long and winding road, the most you get out of this is an injunction. And it would be an injunction, presumably, don't bring the little chips in. They can bring in presumably films, pictures, displays, but just not the little chips. Is that what we're here in this dispute all about? There's a number of points you raise, but this case is really directed to the issue of an injunction, not so much in damages, because the damages are minimal. Sure. But just because the damages are minimal, of course, there is belief under the same… Technically, you have a technical argument, but the question is what's really going on here? What's really going on here is that we attend a trade show in the United States, and we set up a table here, and we have our devices and our salesmen, and they're talking about our products, our patented products. And Synthese spends an enormous amount of money on research and development. It has obtained an enormous number of patents to protect that technology. And there's another company that's a competitor of ours, and they've developed their own products, and they've patented their own products in another company. And then we have GM Rice. And GM Rice might not like this description, but from our perspective, they're a knockoff company that's located down in Brazil. They come up to the United States, and it isn't necessarily just our products that they've copied. They haven't invested, as far as we understand, any research and development. They don't have any patents. They look at everybody's products who they're interested in. They make copies of those products, and then they present those. They talk to people. They talk to distributors. They talk to doctors in the United States. And it has an impact. It has an impact on our sales force. It has an impact on our distributors. It has an impact on everybody. And saying the question, how can somebody in the United States have a table or a booth, in this instance, right next to your booth with your products in that booth, and nobody else can? Why is it that a foreign company can do that, but a domestic company could never have done that? But you wouldn't have an argument, I assume, if they brought in anything but the products. They bring in brochures. They bring in photographs. They bring in displays. Well, I think under the law, that would be a problem. Of course, Your Honor, there wouldn't be an argument. There would be concerns on the sales force. But from a standpoint of the law, you can't bring in the product. Yeah, okay. So your real concern and what's driving the case from your standpoint, Mr. Olson, is that really using the United States as a platform for commercial activities involving a product that you allege infringes one of the patents or maybe more patents of your client. Correct, Your Honor. And it's been a pattern of activity, and that's part of the jurisdictional issue, not necessarily the exact infringement activity. But as we stated in our paper, year after year, show after show, GM Rice has shown up, and they've felt that this was easy to do. We could bring in. We can make more copies. We can bring in more products that are covered by patents. And I'm not saying it's just our products. I'm saying it's the industry's products as a whole. And at some point, I guess the issue was somebody has to do about this, because if you look at the statute, it's a violation of the statute. And in this case, Synthes made the decision, this show, if they show up again with our products right in the booth next to us, we're going to sue them. And that's what happened at that San Diego show. Even though they did not sell their products in the United States? They have actually, as we stated in our papers, that they sold some products for a veterinary application. I thought it was only one product to a veterinary supply house, wasn't it? Correct. I mean, generally they do not sell their products for distribution in the United States, as I understand it. But they're not authorized to do so by the Food and Drug Administration, and also they don't quote prices at these trade shows, do they? Well, I'm not so sure. That's a disputed question, Your Honor. But with regard, that's correct. They did sell, I think, a number of products in one sale to a veterinary application. And they, I am sure, would hope to make more sales for other non-human applications, but they don't have FDA approval, so they're limited as far as what they can sell in the United States. That's correct. Mr. Olson, thank you. I think Judge Bryson's question and your response have been very helpful in framing what's going on in the case for the panel, because I think it's fair to say that his question, your response, touched on an area that probably all of the members of the panel, in one way or another, were thinking about. But why don't you now turn right to what I'll call the real jurisdictional issue, and if you need additional time, we'll let you have it. Thank you, Your Honor. I'm sorry, the personal jurisdiction issue, not a jurisdictional issue otherwise. Well, I think the first question is, and I think the Beverly Hills fan states this issue, is that if there's an infringing act, or at least an alleged infringing act, then jurisdiction exists. You say the infringing act here is the importation. That's the first arrow out of your bow. I think that's the cleanest issue, Your Honor. That's, in fact, where we first looked at this question and said the statute just uses that word, and the Supreme Court authority that we cite as an interpretation of importation is bringing it into this country. And there was no dispute. This was an admitted fact that this company imported into this company, brought these products into this country, and that they used them in a commercial setting. Now, you lay down a very clear, bright-line rule. Let me just give you two hypotheticals, because it's a case that sort of lends itself to this sort of musing, if you will. Sure. Let's assume you have a case where someone enters the United States at the Mexican border in Texas, has with it a bone implant device, the person has it with them, and they drive from the Texas border up to the Canadian border into Canada, and there they engage in a commercial activity. Has there been, within your view, an infringing importation there? No activity at all in the United States. They just drive, they spend one night in Lincoln, Nebraska, and then they're in Canada, and that's the end of it. Yeah. As a matter of statutory construction, I think the answer has to be that is an importation, because, as I stated, the Supreme Court authority is bringing it into this country, and they brought it into this country. You're looking at the Cunard case. Exactly. Even though they don't do anything with it in the United States. That they engage in no commercial activity. No activity at all, just stays in their suitcase or in their car. Correct. I think, my personal view is that that's how the statute is set up, and that's how it should be interpreted. Whether it makes any significant difference to anybody, probably not. This case wouldn't be brought here if it was a mere pass-through, and we point that out in our paper. This isn't a mere pass-through case. This is a case where they intentionally brought it into this country with an intent to engage in commercial activities, and they did engage in commercial activities. Let me give you one other hypothetical. Assume for the moment someone is flying from Mexico City to Vancouver. Yes. And there's bad weather, and their plane is forced to land in San Francisco. Right. And they have in their suitcase the implant device. Is there an importation there? Well, my view... It's crossed the border and entered the United States. Well, let me ask for a clarification of your hypothetical. Would they have cleared customs or not? I was thinking you might come back with that. A duty-free phone chop. Let's assume... So what you're getting at, you would say if they hadn't cleared customs and they just have to sit in the tarmac for a while, there's not an importation. I think that's the reasonable interpretation. All right, well, let's say what if they can't travel, and the airline puts them up in a hotel for a night in San Francisco. So they do clear customs, but they're put in a hotel for the night with their device, and then the next day they get on the plane, the weather's cleared, and they go on to Vancouver. Well, I think the difficulty... I understand your concern, Your Honor, but... It's a case that makes you think about just testing the limits of your position. Well, I think bringing it into the country is best thought of as clearing customs. And the difficulty were, as a person, I would say, you know, that doesn't seem right to me. I think the statute says that would be an infringement, because all the case laws always said that infringement's a strict liability offense. And therefore, yes, technically, have they infringed? Yes, they have. Final question, then I will hush up for a bit until something piques my interest. What about a person who... Okay, the question I was thinking about was answered when you said clearing customs. So I won't ask the question I was going to ask. And so I think, you know, I've thought about those issues as well as where do you parse the line, and that is the question of do you parse the line on intent? And I really don't think you can parse the line on intent, but there was intent here if you want to parse the line there. Do you parse the line on whether there was actual commercial activities that were undertaken? I don't think that's in the statute either, but that also happened here. So wherever I think you parse the line, G.M. Rice, in this case, has crossed that line. You're saying just it's a clear rule, and even though no reasonable person would probably bring an infringement action in those two hypotheticals, for personal jurisdiction purposes, there's enough. Okay, I understand. I'll yield the floor. Well, we surely would not have brought this action, so... I find in this area that while the courts recite the same test over and over again, that the terms they use in reciting the test are kind of fuzzy, and one of the fuzziest is purposeful availment. Can you help me out with what, in the context of this case, constitutes a purposeful availment? Yes, Your Honor. In this case, I think there's very little guidance from this court on a purposeful availment in this situation where a patentee is suing an alleged infringer. There's a number of cases, and we've cited the cases, and there's some guidance there in declaratory judgment. The Red Wing Shoe type cases. There's a number of those cases. And the case that I think provides the most guidance is the Beverly Hills Fan case, and that's the one that's cited throughout the briefs. And that is a case where you have a patentee suing an alleged infringer, and what the court stated in that case is the act of infringement. If there's an act of infringement that occurs within the jurisdiction, and this case was a dispute about whether I think Virginia was a correct jurisdiction and it wasn't an international type situation. But here, because of 4K2 and we have nationwide, we're looking at nationwide contacts, if there was an act of infringement, if importation is an act of infringement or offer to sell or the use, if there was an act of infringement, then I believe that there must be jurisdiction in the United States and there must be purposeful availment. And therefore, that's why I think in Beverly Hills Fan, the court didn't need to go any further. They said, was there an act of infringement that was impacting the Virginia jurisdiction? They said yes, and then I think in the case they said we need to go no further. There clearly was, in our view, obviously a patent infringement is a tort. We are the one that's impacted by the infringing activity and we are a resident of the United States. Is it your position that in view of all the facts that the two officers of the company, who brought the company into the district and they came in and all of this stuff, that there was really no occasion here for the district court to evaluate whether there were sufficient contacts with the forum, that the mere allegations of the complaint themselves were sufficient to establish the international shoe concept of contacts with the forum? Well, I don't agree with how the district court approached the case at all. I think the district court made some significant errors in the case, but I think that it wasn't wrong for the district court to ask the threshold question, to look at Beverly Hills Fan and say, the question I have is whether there was an infringement that occurred in the United States under 4K2, and then the question is, has there been a sufficient allegation of infringing act? And in this particular instance, there was no question that there was an allegation, if import means bring into the country or if there was a use based on these demonstrations that occurred at the trade show or there was an offer to sell. The reason that there was some need to get into some factual development is because of offer to sell. That's a much more factually based argument. GM Rice in this case submitted two early declarations and then another declaration, and that's what led to the discovery and the development of those issues. But if there was no offer to sell issue in the case, I believe since there was no dispute by GM Rice that they were at the trade show and that they had their products physically at, this is a product patent, and they had the products at the trade show, there was no dispute as to those particular facts, and the court without any discovery could have addressed the issue of whether there was importation or use. And if the court concluded that there was either importation or use, then it should have found jurisdiction on the brevity of his claim. Go ahead. Mr. Rohn, let me ask you this. Leaving aside for the moment the importation issue we've been talking about, and let's just focus on what happened at the trade show. Yes. Do we have to decide whether the activities as alleged at the trade show constituted infringement in order to rule on the personal jurisdiction question? I think not. I think what this court can conclude is that there was sufficient, well, there's two alternative bases. One, just under the fact that they had sufficient contacts with the forum, the United States, both before and after the trade show for that matter, that they are subject to jurisdiction in the United States. Even if one assumes that the facts are, as Mr. Lapp alleges, namely that these were not infringing activities? I don't disagree with the conclusion. If this court finds that as a matter of law there was no allegation of infringement, that we shouldn't be knocked out under 12B6 or some other statute. But there's personal jurisdiction, you'd say? There would be personal jurisdiction. And that's the only issue we have to decide, isn't it? Correct. But I think that the question of jurisdiction is an easy question if you find an infringing activity because then it fulfills the requirements of personal jurisdiction. We don't have to find that this activity was infringing, do we? All we have to find is that you have alleged adequately infringing activity. Correct. If you find that, then I think that's the end of the argument. But if you say we're not going to look to make a determination as to whether any of these activities were infringement. We're just deciding whether there was jurisdiction, as I say. Jurisdiction in this case, you can look at all of the activities and what their contexts are with the forum, the forum being the United States again, and make a decision as to whether a jurisdiction. And that's why we say there's four ways for this court to find jurisdiction, whether there was importation, whether there was use, whether there was an offer to sell, or whether the activity is just whatever Jim Rice's context. But in your view, importation, from your standpoint at least, is the easy one because if one says this was an importation, that gets you into the Beverly Hills fan. End of story, there is jurisdiction. I'm hung up on a point that may not be terribly critical here, but can you explain to me when we look to the California long-arm statute for the standards to be applied to the jurisdiction, when we look to 4K2, because I'm unclear as to what the tripwire is for the latter. The tripwire is, there's some presumptions involved, but there was no question that 4K2 applied here either to the magistrate judge or the district judge because it's conclusive if the party arguing against jurisdiction, in this case Jim Rice, states that jurisdiction isn't proper in any state. Jim Rice had come in and said jurisdiction is proper. We don't disagree that jurisdiction is proper in Virginia. We think that if an action would have been brought in the United States, it should have been brought in Virginia. Then you don't necessarily hit the tripwire for 4K2. But as soon as Jim Rice comes in and takes the position that jurisdiction is not proper in any state in the United States, then the statute is pretty clear and the case authority is very clear that you look to their context for the United States as a whole. Well, but why would merely alleging, I don't see anything in the language of the rule that suggests that merely alleging that there isn't a sufficient contact, let's say, with California is sufficient to get you out of the normal rule, which is that you would look to the state's long-arm statute. It says anyone, let's see, if the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, well, they may say that, but isn't it necessary for the court to make a finding to that effect before 4K comes into application? Well, I think jurisdiction is an issue that's waivable. So I think if a party comes in and says this is what our position is in this case, the court can accept that position. I wasn't clear. What I'm saying is you say that as soon as they came in and said you don't have jurisdiction anywhere, that immediately we run to 4K2. Correct. But I don't see anything in 4K2 that tells me that. Well, that's... Because what 4K2 seems to be directed at is a case where the defendant is in fact not subject to jurisdiction in, say, the courts of California. You certainly wouldn't agree to that, right? I mean, you think they are subject to jurisdiction in the courts of California, notwithstanding that it's exclusive subject matter jurisdiction in the federal courts, but that happens all the time. Because I argue that there were infringing acts that were conducted. But as a result of that, we never got into the issue of where the precise infringing acts occurred within the United States. Well, but I take it your allegation is they occurred in the... They occurred at least in California. They may have occurred other places as well, but they occurred at least in California. And therefore, we believe there's jurisdiction in California. But that issue quickly was resolved when we raised 4K2. The magistrate judge agreed with that issue. The district judge agreed with that issue. I'm just wondering whether they skipped over something that I'm missing. I think, you know, there's case authority... Is there a good case that would help me out with this that really lays out the point that, notwithstanding the language, that all you have to have is somebody that asserts that there's no jurisdiction in a particular district, and then you're immediately thrown into 4K2? I'll see if I can get you the case. All right. Well, if you have one, that would save me some poking around. Thank you. That would be helpful, Mr. Olson, supplemental authority. I just have one question. I want to see if I understand it. Your basic position is that as long as there's an adequate allegation in the complaint that there's been an act of infringement committed in the forum state, that itself is enough to establish personal jurisdiction? Is that your basic position? No, that's not my position, Your Honor. My position, obviously, if someone contests jurisdiction, then we have to look at international shoe and all the criteria as to whether there's sufficient context with the United States. My position is that that international shoe and all the other jurisdiction cases becomes very, very simple if there's an act of infringement. That's enough, you say? That's enough under Beverly Hills Fan. And then I think I personally, Your Honor, where I thought this case should have been brought, it should have been under a 12B6 motion to dismiss for failure to state a claim because there was no infringing act alleged, I don't think that they should have been able to contest jurisdiction. I think jurisdiction should have been found to exist. Thank you, Mr. Olson. You've gone over considerably, I guess about nine and a half minutes, so I guess that gives us, we'll round it down, say you've had a total at this point of 24 minutes. Not used up a lot of it. No, no, we all used up. So we'll give you back five minutes for rebuttal, which will give you a total of 29 minutes. And hopefully, if I've gotten my math right, Mr. Lapple, someone will correct me if I'm wrong, but we'll give you 29 minutes of argument if you need it. Thank you, Your Honor. Hopefully that evens it out. That seems perfectly fair, Your Honor. May it please the Court, this Court should affirm the judgment of the District Court. There are two key issues before the Court today. One, whether the term import in 271A should be construed so broadly that it will run afoul of both antitrust law and the territorial limitations on patents in order to cover any bringing in of any accused device, no matter whether it has any effect on the domestic marketplace at all. But should we really go beyond, I mean, the clear, it's always so comforting for a court to be able to look at the clear language of the statute. And whatever the merits, I'll sort of lay my cards on the table a little bit here. Whatever the merits, Mr. Lapple, of the infringement case or the, you know, the injunctive relief case that may be behind this, as Mr. Olson was saying, I just have a hard time every time is getting around this very clear statutory language and thinking, well, you know, they had it, they crossed the border, that seems to be enough. Help me out on that. Yes, Your Honor. I understand that a bright line can be very appealing. But in this case, it will lead to incorrect results. And I think that the proper line that the court should draw, I mean, Mr. Olson admitted he doesn't know how to parse the term import. I think that the way that this court needs to parse the term import is whether or not the bringing in, the physical presence of a device in the United States has any effect on the domestic market for that patented good. Any effect, I don't understand why that should be the standard. If something more than just a simple language is involved, why isn't the answer that for it to be an import under the patent statute, it has to have been imported for a commercial purpose. It doesn't have to be imported for a commercial purpose. And here it was obviously imported for a commercial purpose. They wanted to show it at a trade show. I mean, they weren't bringing it in to put it in a museum or something like that. They were using it for a commercial purpose at the trade show. When you looked at their cost or whatever they had to stand there, they showed the name of their company, I assume. Your Honor, it was brought here for purposes of displaying the device to foreign purchasers. You mean if an American physician came to the desk and said, I'd like to see that, they'd say, where do you practice? And you'd say, well, I practice right here in San Diego. They'd say, I'm sorry, we won't show it to you? Yes, Your Honor, I think that's not only what would have happened, but that is what happened. You mean they actually refused to deal with people unless they were foreigners? They displayed a clear sign on all of their product brochures and on their tables saying the product is not approved by the FDA and is not for sale in the U.S. But they had the people who approved, didn't they? The two officers of the company were there, and I presume they were available to answer questions. Yes, Your Honor. And you say if an American physician came to them and started to ask some questions, they wouldn't answer them? I don't know whether or not they would or would not have answered them, Your Honor, but under the facts of the case, there's no evidence that any American physician did come to talk to them. We have an eight-page sign-in sheet showing that the only people who came and talked to them were foreign residents. I think that if the court says if it's brought here for a commercial purpose and stops there, rather than going on to say it also has to have an effect on the domestic marketplace, you're going to have just as squishy... Well, actually, the effect on the domestic marketplace sounds a little bit like the standard for the International Trade Commission to injure an industry in the United States. Your Honor, I think that's correct, and I think that... But that's not the standard of the patent laws, is it? That's not the standard of the patent laws, but the patent law's entire scope is securing to an inventor the commercial benefits, the benefits of their invention. The whole statute is oriented around commercial purposes and allowing someone to benefit from their invention. It's an incentive system. And so to have someone who comes to the United States and brings a product in that has absolutely no effect on the United States market and, by extension, the patented goods of the plaintiff, that's simply an improper application of what an import is. But let me ask you this, Mr. Amistad. Isn't it true that... I mean, can't one say that in a very real sense the devices were brought into the United States for a commercial purpose, namely to enhance sales of the product, albeit if one accepts all of the G.M. Rice assertions, outside the United States? I mean, there was a commercial purpose in bringing them into the United States in that sense, was there not? I mean, accepting your proposition that they weren't targeted, they had a little Chinese wall up, and I'm not saying that pejoratively, to not target U.S. citizens or U.S. companies or whatever, but still, there was a commercial purpose in bringing these devices in, wasn't there? Yes, Your Honor. There was a commercial purpose, but it was exclusively for trying to advertise or promote the products to foreign purchasers. Patent law is, of all laws, extremely territorial. You have to construe patent laws in terms of the effect it has on the United States market. You cannot go outside of the effects in the U.S. market, and what Synthesis really wants to do is to lock the convention center doors to my client. They want to prevent my client from coming here... But what about... Excuse me, the only reason I interrupt, because time is fleeing, but what about the point I think Judge Bryson raised, that nobody could lock a convention door if there were just photographs or brochures or a slideshow presentation or something like that? I mean, here we have devices, allegedly infringing devices. I think that... I understand your point, Judge Bryson. I think that patent law has got to be applied in an agnostic manner as to foreign and domestic companies, first. And second, what patent law ultimately gives is specific rights to exclude. And unless my client actually violated one of those rights in the United States, then there is no tort on which to hang a personal jurisdiction argument. But that depends on your view that import means something less than its seemingly broad meaning, doesn't it? That's correct. That is correct, Your Honor. Now, I think Mr. Olson says that import is import. Once you step over the borderline, you're there. As long as you pass through customs. Yeah, that's right. As long as you pass through customs. Right. But... He would not accept the idea of just any kind of commercial activity as necessary, even, say, a lesser level that I was hypothesizing as opposed to what you were. I mean, you'd agree there was some kind of commercial activity, but it's not enough because we're in this patent law environment. Correct, Your Honor. Actually, so I think that the definition of import that GM Reyes has posited is a sound analytical framework in which to deal with really the hard cases. And I'd like to point out two district court cases that were cited in the party's briefs where GM Reyes's definition would address both of them, both of which are difficult cases. Now, the first one is Medtronic-Vascular v. Boston Scientific. That's 348 F sub 2nd 316. In that case, there was a bringing in, a shipment of 600 noncommercial stents. An Israeli company shipped some 600 stents to the defendant in Minnesota. Then the Minnesota defendant turned around and sent most of them to their testing facilities in Ireland. Now, the court... I don't quite understand your argument. I gather what you're saying is that despite the allegations of the complaint, even accepting those allegations, there was no way they could prevail on their claim of infringement through importation because what was done was not importation under the statutory standard. That, I understand, is your argument. My question to you is, is that the inquiry in determining whether the district court properly said it had no personal jurisdiction? Because that seems to be solely relating to the merits. Your Honor, you framed the issue exactly correctly, I think, in that it is whether or not our definition of import should prevail or Sintha's definition of import should prevail. Ultimately, in order to determine whether or not there's personal jurisdiction based on an alleged specific act, the district court has some latitude under Rule 12b-2 and has to take that latitude under 12b-2 to evaluate, to some extent, the merits. Now, I'm not saying that the court needs to make... But the district court didn't do that, did it, in this case? The court reached the right result. The court did not do that here, Your Honor. Your argument that the district court has some jurisdiction to evaluate that, I don't see that that helps you in determining, in arguing that the district court properly dismissed the suit for lack of personal jurisdiction. Your Honor, I would respond to that by saying that this court should evaluate judgments, not opinions. The district court reached the right conclusion, even if I would have had them write the opinion a little differently. Sorry, to return to my analogy, two different cases, Fellows v. Michel and Prosperity and Medtronic-Vascular v. Boston Scientific. In Medtronic-Vascular v. Boston Scientific, there was a bringing in of 600 stents. The district court said that they were non-commercial in nature, but ultimately found that there was no personal jurisdiction against that defendant, primarily because they said that that was a de minimis infringement, or that there was no infringement because it was de minimis. A case on the other side is Fellows v. Michel and Prosperity Company, 491 F. Sub. 2nd, 571. Now there, you had a situation where a Chinese manufacturer of paper shredders brought in just a handful of devices to the U.S., but the purpose that they brought them in for and what they were ultimately used for in the U.S. was certification by underwriters' laboratories. It was clearly a step that was being taken in order to eventually be able to sell products in the United States. Clear impact on the domestic market, whereas in Medtronic-V. Boston Scientific, no impact on the domestic marketplace, even though in Fellows, you have a handful of devices coming in and staying here, and in Medtronic, you've got 600 of them, some of them staying here, some of them being sent elsewhere. Ultimately, the touchstone, both these cases can be resolved correctly in the same way that they were resolved under the rubric that I'm suggesting. Let me return, if I could, to Judge Friedman's question of a moment ago, because it's, I think, a central inquiry that the briefs don't really squarely address, at least. If I have an innovative tort theory, let's say, of strip liability in a setting in which a particular jurisdiction has not recognized tort liability yet, but I'm hopeful that I can persuade them to do so, and I file suit based on the tortfeasors having, in my view, committed that tort. Does the court, in looking at a personal jurisdiction question that arises in that setting, have to decide the question of whether that is a viable theory of tort liability before finding that I am, that I can properly bring the defendant into court in that jurisdiction? Or is it simply the assertion of the commission of the tort in a non-frivolous way that is sufficient to satisfy 12b-2, and then the question turns into a 12b-6 question? I think that the answer to your question is yes, the court does have to evaluate that, and in almost all practical circumstances, I would file both a 12b-2 motion and a 12b-6 motion, and I think any reasonable practitioner would also do so. So I think the answer to your question is yes. That seems tantalizingly close to saying that if you haven't got a strong case on the merits, you can't bring the defendant into court, because I'm not sure what the difference is between having a theory that works as a legal matter and having a sufficiently strong factual presentation that you have a decent chance of winning your case. I understand your concern, Your Honor. In other words, if these, suppose this exact same case, but you were actually selling the items in San Diego, would it be necessary in that setting for the court to decide whether the items in fact were anything even remotely within the scope of the patent? Could you defend against personal jurisdiction by saying these aren't infringing objects? No, Your Honor. You're asking if the court would have to hold a full Markman hearing before they could decide a 12b-2 motion. Or even take a sort of quick look at it and say these aren't even close. Right. No, Your Honor. I don't think that that is necessary, because in that circumstance, you would have conflicting and contested evidence, and here we don't have conflicting and contesting evidence. You say it's pure question of law. Pure question of law, Your Honor. Do you claim that the district court committed reversible error in failing to decide whether or not there had been a valid allegation of infringement? In other words, you say the district court committed an error that before it dismissed it for lack of personal jurisdiction, it first should have determined that they didn't adequately allege importation. No, Your Honor. I have not alleged and do not believe that the district court committed an error. Let me put another question, suggest to you that what's really involved in this aspect of the case is something like this. There's a general principle that an appellate court can affirm a judgment on any ground shown by the record. And in applying that here, what you seem to be saying is you can affirm it on the alternative ground that they haven't established adequately infringement because infringement is more than just bringing it into this country. It seems to me this presents the question of affirming the judgment. Well, what do you mean by the judgment? Do you mean an order dismissing the complaint or is it a judgment dismissing the complaint for lack of personal jurisdiction? It seems to me it comes up here, Your Honor, dismissal for lack of personal jurisdiction. What you seem to be saying is you can affirm it on the alternative ground but the district court should have dismissed the case for another reason, a reason that the district court didn't adjudicate. Yes, Your Honor, I think that's correct. That's what you are saying. Yes, sir. And I have, candid, like Judge Scholl, I have some question about that. I don't know whether that is the proper standard or not. Mr. Labol, let me ask you, at the end of your colloquy with Judge Bryson a minute ago, you said that here we don't have to get into the sort of factual question of whether there was infringement or not because personal jurisdiction turns solely on a legal issue here, correct? Yes, Your Honor. And I assume, I want to make sure I understand, the legal issue, you would say, is first of all whether, as a matter of law, there was here an importation, right? Is that it? I want to make sure I understand what you say is the legal issue. Yes, Your Honor, that is my understanding of what the legal issue would be. Obviously, I would prefer that Synthesis had actually, during the 18 months of litigation, had identified what the alleged infringing device was, which they still have not yet done, but the question, as you frame it, is the one you have to address. Well, for personal jurisdiction. Yes, Your Honor. And so do we have to, and I'm kind of going to ask you the same question I think I asked Mr. Olson, let's leave aside the question of the coming-across-the-border issue, I'll call it. Do we have to get into, in any way, you would say that we don't have to get into in any way whether or not there was infringement in the activities that took place at the trade show? I'm sorry, Your Honor, I didn't understand your question. I didn't phrase it well. Do we have to consider at all whether there has been an allegation of infringing activities at the trade show? For personal jurisdiction for analysis. Under the circumstances of this case, yes, Your Honor. Because the... I mean, why is that? Because certainly when one thinks of personal jurisdiction, and maybe I'm being too crude, they say, you know, was the body there? Was the person there? Were they doing something? Okay. Certainly, the GM Rice representatives were at the trade show doing things. They allegedly, I emphasize allegedly, accused the allegedly infringing devices were there. So there was a presence, there was activity. Why is that not enough? Your Honor, I think your question simplifies this Court's standards for finding a specific personal jurisdiction respectfully. There has to be a direction of activities at residence of the forum, which the District Court found there was not. And those specific activities have to give rise to or relate to the cause of action. And the personal jurisdiction cannot defend traditional notions of fair play and substantial justice. And you're saying there was no direction at residence because of what you say was the policy of GM Rice to sort of, and I'm not being pejorative, sort of turn a cold shoulder, if you will, to any interest from United States individuals or companies. Yes, your Honor. And that's the basis the District Court dismissed on. But I think that this Court can and also should dismiss or should affirm based on the fact that the activities never gave rise to any viable cause of action, no importation. Third, if you may, unless there's further questions, I'd like to use the remainder of my time to address the third prong, which is traditional notions of fair play and substantial justice. Here in this case, the five factors, the five prongs of the assessment for fair play and substantial justice all either favor my client or only very weakly favor Synthesis. Now, the first one is burden on the defendant. Here, we clearly have a very high burden on my client. The Court deals in English, not Portuguese. It's a 17-hour plane trip from Sao Paulo to San Diego. And you're going to be forcing my client to defend against a lawsuit based on, as we all recognize, the bringing in of basically five pieces of metal that are worth seven bucks each. But doesn't the distance here, albeit you're correct in terms of the flight, I'm sure, but isn't that argument a little bit undermined by all the times in the past when the GM Rice representatives have come to the United States for commercial activities? I mean, it doesn't seem to be that coming and going doesn't seem to be on its face that much of a burden for the company.  but I think that there is also a difference between being able to come once every six months or once a year to attend a single trade show or a trade show every six months versus being forced to come regularly to defend a lawsuit in the jurisdictions. Yeah, certainly one would rather come to try and sell a product than to sit in a courtroom and be sued. No, I understand what you're saying. Another thing I'd like to... I would bring to the Court's attention, this Court made a decision in September in Medical Solutions v. Seachain Surgical, a case that you were on, Judge Bryson. The facts in that case were very, very similar to the facts here. There you had a North Carolina company coming to the Washington Convention Center to a trade show, having medical devices, in that case a surgical warming tray, sitting on their table. This Court ultimately determined the district court was correct in dismissing for lack of personal jurisdiction because there was no use. As a matter of law, there was no use because the device was never used for the purpose for which it was intended. Very similar analogy to what we have here. Well, for purposes of the use prong, anyway. For purposes of the use prong. That doesn't help us with the importation prong, which I think is the principal arrow in Mr. Olson's quiver. It does, Your Honor, but it also goes to address some of your concerns about how deeply into the merits the district court has to go. I understand. You were talking about the fair play... I was, Your Honor. You mentioned burden on the defendant. Okay. If you could go through the other factors with us, that would be helpful to me. Yes, Your Honor. With respect to medical solutions v. C-Change, I think that that's illustrative of the lack of the forum's interests and the policy interests that need to be evaluated, the fourth and fifth prongs. Namely, if jurisdiction is found here, it would be on the basis of an importation, whereas under very, very similar facts to medical solutions v. C-Change surgical, there was no personal jurisdiction. The only difference is you're going to be treating foreign companies differently than you're treating U.S. companies, and I think the patent law needs to be applied in an agnostic manner as to foreign and domestic. So that was where... Okay. Also, as to the other factors, I think that number two and three, interest of the forum state and the plaintiff interest in obtaining relief, they're very weak here. As you pointed out when you were questioning my opponent, Your Honor, this is really... It's about five pieces of metal that were sitting on a table, and my opponent said, well, damages are obviously minimus, but what we're talking about is an injunction. So are we going to be forced to go through an entire lawsuit ultimately to possibly seek an injunction, which, as you know, Your Honor, injunctions are no longer automatic in the Patent Act under eBay v. Merck. We have no way of knowing at this stage of the litigation what ultimate relief might be granted if the district court has jurisdiction and if the plaintiff prevails in its case. We don't know what sort of an injunction would be granted. You know, I suppose they'd be enjoined from bringing any infringing products into the United States. Maybe it might be limited to showing at trade shows. Maybe it's a broad injunction. I don't know. We don't know. You're right, Your Honor. We don't have perfect foresight. We don't know for sure what any proposed injunction would be, but what I'm pointing out is that the interests of the plaintiff and the interests in the forum are clearly less here where they're seeking such minimal relief versus the case of where if they were hundreds of millions of dollars down... Does that affect whether the jurisdiction exists? I think under the Fair Plains Potential Justice test, Your Honor. Yes, it does. Your Honor, as I say, I have about two and a half minutes left. I'm essentially concluded, but would be happy to answer any other questions. No, thank you. I think we're all set, Mr. Lapple. Thank you very much for your presentation, and we'll close with Mr. Olson. Thank you, Your Honor. I think you have... I was going to give you five minutes, additional five minutes. Thank you. Let me address first your question, Judge Bryce, because the matter wasn't briefed here because it was resolved below and nobody contested it. At page... of the appendix A421, there's a case, there's a discussion about 4K2, and there's a case cited there, United States versus Swiss American Bank, 191, Fed Third, at page 30. It's a First Circuit case from 1999. Okay, I'll read it and get the answer I expect to my question. Thank you. Let me ask you, and this was... Mr. Lapple sort of touched on this. At the opening of your argument, main argument, in your response to Judge Bryson's question, you, in a very clear fashion, outlined the various reasons why this action was brought. Correct. You articulated them. Where in there, though, assuming everything you say is correct, where in there is a patent law violation? In other words, you talked about how there's the problem of having your company representatives sitting there and having right next door this allegedly infringing product but not to be sold in the United States, if we accept that for the moment. Where's the really infringing activity there, leaving aside the importation that's already taken place? One qualification, too, because I don't agree with that exact state of facts, because we do know that they can't sell it for human use, but they've already attempted to sell product, and it was actually before this patent issued, for veterinarian applications where you don't require FDA application. Are you saying there's a disputed factual issue here, whether or not they were attempting to sell their product in the United States? All I'm saying, Your Honor, is that we know that they have made sales. One sale. I think one is enough, but one sale to a veterinarian application, so they do have some actual interest to sell in the United States, but they can't, under FDA regulations, sell those for human use. But I believe, putting that aside, that there obviously is commercial activity. There was no, as you used the words, Chinese wall. These were not things that they actually brought out. If a customer came, they confirmed that they were from another country. I don't think any of this makes any difference, but that's not what they did. They had these on a table. U.S. physicians could see it. U.S. distributors could see it. Competitors could see it. Everybody could see. Another domestic competitor of ours could see it and said, apparently you can do this, and nobody can do anything about it. And so another competitor would say, Synthes doesn't care about this patent. They don't care about those products. People can't actually, at trade shows, slice things that narrowly. The question is, is it permissible? Is that something that you claim is protected by your patent or is it something you don't claim protected by your patent? Are you suggesting that if you didn't take this action, your competitors would say, we don't have to worry about Synthes' patents. They're not enforcing them. I don't want to go that broadly, but we're talking about sales people, distributors. We're not talking about a bunch of lawyers, patent lawyers that are at this trade show. And the question is, does that have any impact on our business? I don't think we can sit here and say it doesn't have any impact and surely we would have brought this lawsuit if we didn't think it had some. We think it has an impact on our business. We may be wrong about that ultimately, but our belief that it has an impact is enough to justify bringing this suit. Correct. And it's especially true, the point I was making is why it's especially true that that impact's apparent is the fact that these were fully on display for any comers. And it wasn't in brochures, it wasn't private showings, but I don't think that is the particular issue at hand because I think they were engaged in a commercial activity. And let me point out in the reply brief what we raised with the court after they had raised this impact on domestic issue is that with regard to use, we all know that there's an exception to the infringement and that's experimental use. We cited the case Madley v. Duke in another couple of cases I believe, but in Madley v. Duke, what somebody... I'm sorry, Mr. Olson, I apologize. We're going to have to finish this thought and then we will have to bring things to a close. Yeah, let me just finish the thought. This is the fact that this court has said that if there's going to be any exceptions made and that's what this is requesting, an exception made to importation that there is some sort of trade show exception or some...it doesn't have a domestic impact. That's the question. Thank you. Mr. Olson, thank you. Mr. Lapple, thank you. The case is submitted. Thank you. All rise. The Honorable Court is adjourned from day to day. Thank you.